[Crim. No. 4175. In Bank.—December 30, 1938.]

THE PEOPLE, Respondent, v. WILLIAM MARTIN et al.,
Appellants.

Roland T. Williams, and Frederic H. Vercoe, Public Defender, for Appellants.

U. S. Webb, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Respondent.

CURTIS, J.—The defendants William Martin and Edwin W. Spotts were jointly accused by information filed in the Superior Court of Los Angeles County of having murdered Sam Tanner, on or about January 8, 1938, in the city of Los Angeles. They were tried together and convicted of murder of the first degree without any recommendation by the jury that a lesser punishment than the extreme penalty should be imposed. Accordingly judgments imposing the death penalty upon each were pronounced by the court. Separate appeals were taken by each defendant from the judgments of conviction and from the orders denying motions for new trials.

The main facts with reference to the crime are undisputed and disclose that the homicide was committed in an attempted holdup of a grocery store, during which the proprietor was shot down in cold blood, without even the semblance of any resistance on his part. Moreover, not the slightest extenuating or mitigating circumstance appears in the record. On the evening of January 8, 1938, about the hour of 8 P. M., Martin in company with Spotts drove up to Tanner's Food Center, located at 1603 Grand Avenue in the city of Los Angeles. Spotts, who was driving his Chevrolet roadster, stopped the car facing west on Venice Boulevard, about forty yards from Grand Avenue. Spotts remained outside in the car while Martin entered the store through the Grand Avenue entrance. When he entered the store there were only two persons in the store, a meat cutter by the name of Charles Read, and Sam Tanner, the proprietor, who was seated on some milk crates in front of the cash register. Martin, holding a Colt automatic in his right hand approached Tanner, saying at the same time, "This is a holdup. I want your money." Tanner continued facing Martin without moving, and Martin repeated, "I want your money." Read, who had taken a couple of steps back when he saw Martin with the gun, told Mr. Tanner to hand over the money, the man "meant business". As Tanner started to get up from the milk crates, Martin fired point blank at him, then turned and fled. Tanner was immediately taken to the hospital in an ambulance, where he died some twenty-four hours later. The bullet which had been fired from the Colt automatic was found on the floor close to where Tanner had been sitting, and the exploded shell was found under the cigarette counter.

Martin was arrested on the morning of January 14, 1938, by three police officers. A police officer, who was a ballistic expert, made tests with the bullet found in Tanner's store, and stated positively that the markings on it showed that it had been fired from the .32 Colt automatic which was found in the flat of Martin when arrested, hidden under a cushion of the divan, fully loaded and with the safety catch off. Martin, upon being informed that the gun in his flat had been tested by a ballistic expert and found to be the gun used in the murder of Tanner, admitted that he was the person who had fired the fatal shot. His statement was taken down in shorthand, and after being transcribed was signed by Martin. In this statement, he said he had gone over to the house of his friend, Spotts, earlier in the evening and drank some beer, that he told Spotts he "was going to look over a place and would he drive". He stated that he had Spotts park on Venice Boulevard while he entered the store. Towards the end of his statement he said, "He [Spotts] did not know I was going to do that job." He further said that after the shooting he and Spotts drove to a beer parlor where they had some beer before separating and going home. It was at the beer parlor that he told Spotts he had shot a man. Spotts was arrested, and likewise made a statement. In this statement he did not deny that he knew of the proposed holdup, but stated that all he knew was that, "I drove the car and Martin went in and held up the grocery store." At the trial Martin did not take the stand, but his statement was read in evidence accompanied by an admonition by the trial court to the jury that said statement should be considered only with reference to the guilt of the defendant Martin, and should be eliminated from consideration in determining the guilt or innocence of Spotts. Spotts took the stand and denied guilty knowledge of the holdup, claiming that when Martin left him and entered the store, he was under the impression that Martin was going into the store to get some beer, and that he did not know that Martin at the time was carrying a loaded gun.

As different grounds for a reversal of the judgments are presented by each of the defendants, we shall consider their appeals separately, and shall first discuss the contentions advanced by defendant Martin.

No question is raised as to the guilt of the defendant Martin. Indeed, in view of the record, such a contention could

not be seriously made. All the efforts of defendant Martin are directed toward an attempt to secure a reduction in the penalty imposed to imprisonment for life. Defendant claims that the trial court committed prejudicial error in refusing to give three instructions requested by him regarding the discretion of the jury in a case of first degree murder, and hopes by establishing error on the part of the trial court to secure a new trial with the possibility that upon a new trial the jury will bring in a recommendation for life imprisonment instead of a verdict which requires the death penalty.

■ There is no ·merit whatever in the contention of the defendant. The three instructions requested by defendant Martin all referred to the discretion of the jury in determining the penalty in a first degree murder case, and were to the effect that there are no presumptions or intendments of the law in favor of the death penalty in such cases; that it was not necessary for extenuating or mitigating circumstances to exist to authorize the jury to bring in a recommendation for life imprisonment; and that if the jury should be in doubt as to the proper penalty to inflict,· the jury should resolve that doubt in favor of the defendant and fix the lesser penalty. The defendant was not entitled to have such instructions given to the jury. ■ The authority relied upon by defendant not only does not support his contention, but directly holds that the proper practice for the trial court is to refrain from giving any instructions which might have a tendency in the slightest degree to influence or control the discretion of the jury in its determination of the proper penalty in a case where the defendant is charged with murder in the first degree. (*People* v. *Bollinger*, 196 Cal. 191 [237 Pac. 25].) Indeed, that case went so far as to hold that the giving of an instruction by the trial court, was not prejudicial error which told the jury that, ''If the jury in this case should find the defendant guilty of murder in the first degree and they also shall find the further fact that there is some extenuating fact or circumstance in the case, it is within their discretion to pronounce such a sentence as will relieve the defendant from the extreme penalty of the law. The jury in a criminal case for murder is vested with a discretion but the discretion is not an arbitrary one, and is limited to determining which of two punishments shall be inflicted, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed. If the evidence shows

the defendant to be guilty of murder in the first degree but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder in the first degree, and leave with the law the responsibility of affixing the punishment.'' The court then made a detailed analysis of the authorities upon the subject and concluded its discussion with the following language: ''We have, however, gone into the subject in the hope, if not the expectation, that the practice of giving such instructions may be abated, thus giving assurance that the penalty reflects the decision of the jury alone and at the same time sparing this court the necessity of repeatedly passing on such assignments of error. And considering the numerous occasions this court has held that section 190 of the Penal Code confers on the jury alone the discretion of determining the punishment in cases of guilt of murder in the first degree, trial courts, especially where a human life is at stake, should not interfere with the discharge of that solemn duty by the jury.'' It is obvious that if the discretion of the jury is to remain uninfluenced by the trial court, instructions favorable to the defendant are as objectionable as instructions unfavorable to defendant. Therefore the defendant here, in asking the trial court to give the three requested instructions was simply asking the trial court to violate the rule announced in the decision just cited.

We agree with the pronouncement of the court in that case (*People* v. *Bollinger, supra*), as to the proper practice of the trial court, and recommend for future use to trial courts in similar cases the instruction on this subject given by the trial court in the instant case. It is as follows: ''The law of this state provides that every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury. If you find that the defendant is guilty of murder in the first degree it will be your duty to fix the penalty. It is entirely for the jury to determine which of two penalties is to be inflicted in case of murder in the first degree, the death penalty or confinement in the state prison for life. If the jury should fix the penalty as confinement in the state prison for life, you will so indicate in your verdict. If, however, you fix the penalty at death, you will say nothing on this subject in your verdict, nor will you specify the death penalty in your verdict. In the exercise of your discretion as to which punish-

472

ment shall be inflicted you are entirely free to act according to your own judgment.''

■ The defendant Edwin W. Spotts seeks to avoid the results of his admitted participation in the affair and his presence at the scene of the crime by claiming that while he did aid Martin by driving him to and from the scene of the crime in his Chevrolet roadster, he did so, not knowing that Martin was planning to rob the store, and that he did not *abet* Martin in the commission of the felony by reason of the fact that at the time of its commission, he had no guilty knowledge of it. It is, of course, the well-settled law in California that if a human being is killed by any one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the crime of robbery, whether such killing is intentional or unintentional, or accidental, each and all of such persons so jointly engaged in the perpetration of, or attempt to perpetrate such crime of robbery, are guilty of murder of the first degree. (*People* v. *Perry,* 195 Cal. 623 [234 Pac. 890].) Specifically stated, defendant Spotts' contention is that the evidence adduced at the trial is insufficient to sustain his conviction for the reason that there is no evidence which establishes his guilty knowledge of the robbery. It is obvious that the only evidence which would prove conclusively, beyond the shadow of a doubt, the existence of guilty knowledge on the part of the defendant Spotts would be his own statement or confession to that effect. And it must be conceded that in his statement to the police officers after his apprehension he did not directly admit that he knew the robbery was to be committed, his language in this respect being, ''I drove the car, and Martin went in and held up the grocery store; that's as far as I know''. ■ However, the existence of such knowledge or intent need not be directly and positively proven, but may be inferred from circumstances. And whether or not the alleged aider and abetter knew and shared the principal's criminal intent is a question of fact for the jury to be inferred from circumstances. (*State* v. *Ochoa,* 41 N. M. 589 [72 Pac. (2d) 609].) In the instant case there are certain facts and circumstances which tend quite convincingly to prove a guilty knowledge on the part of the defendant. The fact that Spotts failed to immediately deny, both vigorously and vehemently, that he had

any knowledge that a robbery was in contemplation when Tanner was shot, is indicative of the fact that he did share Martin's guilty knowledge. For an innocent man to fail to protest his innocence when questioned upon his arrest and to merely say, ''I drove the car and Martin went in and held up the grocery store; that's as far as I know,'' is scarcely conceivable. There are also other facts admitted by Spotts which are indicative of guilt; the fact that he had known Martin intimately for over five months; that a month before he had given Martin the Colt automatic with which the fatal shot was fired; the fact that he admitted that he himself had been carrying a gun, although at the time he was unarmed; the fact that he knew Martin had been carrying a gun on other occasions, although denying that on this particular occasion he knew that Martin was armed; the fact that he stopped the car around the corner about forty yards from the grocery store where the license plates would not be noticed by anyone who might view the crime; the fact that in his statement he said that he drove around in front of the market twice before Martin attempted the robbery, whereas on the stand he testified that he had driven in front only once; the fact that just previous to the attempted robbery Martin and Spotts took a circuitous drive, strongly indicative of a reconnoitering expedition, Spotts testified that after leaving his house earlier in the evening and stopping at a dance hall where Martin did not get out and he merely glanced in, ''I drove south on Flower to 18th Street, went west to Figueroa and went back up Figueroa to Venice. I went east on Venice to Hope, south on Hope to 17th, east on 17th to Grand, went north on Grand to Venice and then I went west on Venice.'' These facts and circumstances were sufficient to justify the conclusion of the jury that Martin and Spotts were engaged in a joint enterprise and that Spotts, when they started out that evening, intentionally embarked with Martin on a deliberately planned crime.

It may be conceded that there are some other facts which tend to exonerate the defendant Spotts, as for instance, the fact that he did not park directly in front of the entrance of the store where Martin could make a quicker getaway, as well as the fact that he stopped the motor of his car while waiting for Martin. This latter fact, if true, would be

474

strongly indicative of his innocence, but the truth of the fact depends solely on the statement of Spotts and may well have been discounted by the jury. Considerable emphasis is placed by counsel for the defendant upon the fact that the automobile used was a 1931 Chevrolet roadster which was very noisy, and it is implied that if Martin and Spotts had planned the robbery, they would have used a less conspicuous car. Inasmuch as the car used belonged to the defendant Spotts, and he and Martin apparently had no other car at their disposal, this argument seems to be entitled to little weight. The jury evidently weighed all of the evidence, as it was their function to do, and found against the contention of the defendant Spotts that he had no intimation that Martin intended to hold up the store when he drove him to the store and waited outside for his return. ■ The finding of the jury by its verdict, and the trial court in its refusal of a new trial, are conclusive upon this court unless it can be said as a matter of law there is no evidence to support it. (*People* v. *Tedesco,* 1 Cal. (2d) 211, 219 [34 Pac. (2d) 467].) After a careful examination of all the evidence, we cannot so conclude.

■ Defendant Spotts also claims that the court committed prejudicial error in refusing to give two instructions to the effect that a conviction cannot be had upon the testimony of an accomplice unless corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. We are satisfied that the trial court properly refused to give such instructions. In the first place, defendant Martin did not take the stand, and consequently, so far as Spotts is concerned, there was no testimony of an accomplice introduced. And although the confession of Martin was read in evidence, it was accompanied by the admonition of the court that it should be considered only with reference to the guilt of the defendant Martin. Moreover, aside from the testimony of the autopsy doctor and Mrs. Tanner, which established the death of Tanner, and the testimony of the ballistic expert which proved the fatal bullet had been fired from the gun of Martin, it was Spotts himself who freely admitted being at the scene of the crime and who furnished the evidence with reference to the particular circumstances from which the jury deduced the fact of his guilty knowledge.

 Defendant Spotts also predicates error upon the fact that the jury found by a special verdict that he was armed with a deadly weapon at the time of the commission of the crime. While it is true that there is no evidence that Spotts was in fact armed, and he denied that he was armed on this occasion, it is apparent from the fact that the information charged that, "at the time of the commission of the offense said defendants were armed with a deadly weapon, to-wit, a .32 automatic pistol", that the jury were under the impression that the possession of the pistol by Martin was possession by Spotts. In some instances, the question of whether or not the defendant was actually armed would be a question of vital importance, but in the instant case it is absolutely immaterial for the reason that the defendant Spotts is guilty of murder in the first degree, regardless of whether he was or was not armed, by virtue of his participation in the commission of the crime of robbery during which a homicide was committed by another person.

We are satisfied that no errors were committed by the trial court, and that the verdicts of the jury were amply supported by the evidence.

The judgments and the orders denying new trials are affirmed.

Shenk, J., Seawell, J., Edmonds, J., and Waste, C. J., concurred.

HOUSER, J., Dissenting.—I dissent.

In my opinion, as to defendant Martin, the judgment should be affirmed. But as to defendant Spotts, I am unwilling to concur in a judgment, by reason of which,—founded as it is upon such equivocal and unsatisfactory evidence of his guilt as appears in the record of the case,—he shall suffer the penalty of death.

Langdon, J., concurred.